and California Forensic Medical Group. Good morning, counsel. Good morning, and may it please the court, Fulvio Cajina, appearing for plaintiffs. I'd like to reserve three minutes for rebuttal. This is a case about a 39-year-old man who was homeless, schizophrenic, suffering from chronic kidney disease, latent and chronic tuberculosis, who was in jail for two months, and in that time period lost 8.7 percent of his body weight. During that time period, he requested medical assistance on three occasions, and he was never once seen or evaluated by a doctor. Within two months, he was found dead in his jail cell. Counsel, in Dr. Omari's expert report, does that create enough of a triable issue of facts that, in fact, there Dr. Omari testified that the autopsy confirms that if Hector was provided with adequate medical examination and basic laboratory testing of his blood, the cause of his weight loss would have been identified and treated, and his unexpected death at the age of 39 years old would have been avoided? Does that create enough of a triable issue of facts such that summary judgment was inappropriate? Absolutely, Your Honor. That's why—  Explain that, because the judge seems to decide otherwise. Well, with all due respect to the trial court, the trial court found or held that plaintiff's experts could not pinpoint the sole cause of death for Mr. Hernandez. However, that's not the standard, especially in a medical context. Human beings aren't cars. You can't open the hood and say, the crankshaft is broken. That's why the engine doesn't work. We have many different things happening in our bodies at once. And so in Lemire and in Messick, the Ninth Circuit has held that a plaintiff is not required to eliminate all other causes of death. You just have to show that there is a more likely-than-not probability that what defendant's actions—what defendant's actions were taken was a substantial factor in causing that death. And here, that's precisely what Dr. Emalu— But don't we need to have some idea as to what the cause of death was? Well, Dr. Emalu says— We have at least three things, two of which come from your experts, and they're different. Well, actually, we have many different causes of death. Dr. Iocco, the initial medical examiner, said that Mr. Hernandez died because he choked on his blood because of aspiration. We asked their experts, was this true? They said, no, that wasn't what caused his death. Dr. Emalu, who is the pathologist, who is the most person—the most qualified person to testify on this issue of medical causation, he testified that Mr. Hernandez died due to unaddressed and unevaluated, unintended chronic weight loss that arose from— No, he didn't say that he died from weight loss. No, that arose from the chronic kidney disease being not treated. That's what he said. He said he died of kidney disease. Right. And Dr. Swabe says he died of pneumonia. Right. Although, Dr. Swabe does—again, he's not a pathologist. Dr. Swabe was there to testify. But you introduced his testimony. Are we supposed to credit him or not credit him? Did you want us not to credit him? Dr. Swabe's testimony is to set the standard of care for the treating physicians. Right, but we're still trying to figure out, what did he die of? Well, and let me tell you what the problem is for me, is that you've suggested that they had to investigate his unintended weight loss. Dr. Omalu gives us this enormous list of things there on his—it's 2ER195. You know which list I'm talking about. It can be cancer. It can be dementia. It could be depression. It could be heart failure. It could be AIDS. It could be tuberculosis. It could be Parkinson's disease. And that's just a universe of problems. And without being able to identify anything or tie something to this, you've created an Eighth Amendment standard that says, well, if somebody loses weight, you're going to have to work up a full medical and send them out to all kinds of specialists because it could be anything. Well, it's a Fourteenth Amendment standard in this case, but again, that's not what Dr. Omalu's declaration—that's not exactly what it says. What it says is, unintended weight loss can arise from all of these things. In this case, he testified to a medical certainty that Mr. Hernandez died from chronic kidney disease. That was the underlying reason why he had this 8.7 percent weight loss. And in fact, when I actually deposed their experts, I believe it was Dr. Quircy who said that, yes, Mr. Hernandez was suffering from Stage 3 kidney disease, that he had very high creatinine levels, and again— Now, Dr. Swaby said something different, right, in terms of the cause of death. So, the question, I guess, I have for you is, do we then—should that go in front of the jury and they make a determination of which expert they need to credit? But you see the problem, though, is you can have all of these different sort of causes, which is going to judge Bybee's concern here, right? So, at what point do we say, hey, this is not enough? That's the issue. Okay. First of all, again, the case law says, if there's multiple different opinions from experts, then guess what? It's a question for the trier of fact. Could you please do me a favor and point to me what expert testified that weight loss was a substantial cause of either kidney disease, heart failure, or any other cause of death? Yes, it was Dr. Amalu. Where? It's 2ER201. It says, if Hector Hernandez received a competent medical and clinical evaluation to determine the cause of his weight loss and kidney disease, he would have received the treatment he needed and, more likely than not, would not have died at the age of 39 years old. And what's the causative relation between weight loss and death? So, if—it's not regular weight loss. Does he say that weight loss exacerbates the kidney disease? So, no. It's the opposite, actually. He's not saying that you died because of weight loss. You died because of unintended weight loss. Give me some evidence that you've submitted that shows that the weight loss was considered by the expert witness as a substantial cause in part or in whole of causing the death. And you've cited 2ER201. Is that it? No. There's 2ER195. At the age of 39 years old, most of the causes of unintentional, unexplained weight loss can be managed, treated, or controlled to significantly reduce the progressive decline of health. Basically, what he's saying is— You're going too fast. I'm not catching you. Maybe you— Sorry. Slow down. Is 2ER185—  And what does it say there? At the age of 39 years old, most of the causes of unintentional, unexplained weight loss can be managed, treated, or controlled. That's a statistical question. No. That's Dr. Omalu saying. He gave a list of all the things that can cause unintentional weight loss, which includes chronic kidney disease. Right. He says all of these things can be treated if they're properly evaluated. If you catch it in time, if you do something about it, you can treat it and prevent this continued loss of weight that will lead to death. Then he says— How does it lead to death? What is the cause of death, kidney disease or heart disease? My question to you is what does weight loss have to do with kidney disease or congestive heart failure? And who says that the weight loss was a substantial factor in either of those causes of death? So, again, the unintended weight loss is a red flag. That's what it is. It's a red flag that there's something wrong with the person. And, in fact, their own physician assistant, Mr. Cooper, testified to that. So it would be a headache. But tell me, where's the evidence that weight loss exacerbates or causes kidney disease or congestive heart failure, which were the two causes that I saw of causes of death? It's the opposite, Your Honor. It's that unintended weight loss is a symptom of the chronic kidney disease. And their own expert testified that if you have untreated chronic kidney disease, you can have a sudden cardiac arrest. So the negligence was in not recognizing that unintended weight loss was, as you call it, a red flag. Yes. And a reasonable medical provider would have then recognized that this would exacerbate kidney disease or heart congestion. Yes. Is that your point? Okay. Yes. Well, that's what I understood your point to be. Yes. It was a lack of treatment that would identify the weight loss that then would have resulted in getting the blood work, that would have resulted in doing the proper exams, that would have resulted in all of these things. That's what I understood your point to be. Absolutely. And here, we're kind of put in this tough situation where because they failed to do anything, because there are no labs, because they didn't even take his vitals, they wouldn't even check to see if he had a fever, they wouldn't check what his blood pressure was. Because they didn't do any of that, there is a dearth of evidence as to why he was dying. However, our expert says, Dr. Amalu, and again, this is a question of fact for the jury, look, he had this huge weight loss and he's begging for help. He's saying, please help me. He actually says, please help me in one of the notes. It goes unaddressed. Dr. Amalu is saying, had it been addressed, they would have seen that he had a chronic kidney disease and they would have addressed that, he wouldn't have died. And here, their own expert, Dr. Corsi, testified that if you have chronic kidney disease, that's a risk factor for sudden cardiac arrest. Counsel, I didn't ask you whether you wanted to reserve any time. Did you want to reserve any time? Yes, I was going to reserve three minutes, Your Honor. All right. So you've got it. Why don't you have a seat and we'll hear from the other side. Thank you. May it please the Court. My name is Lindsay Romano. I represent the Appalese Wellpath, Inc., CFMG, and employees Casey Labon, Corey Levin, and Jeffrey Koop. I think that Your Honors identified and crystallized the issue. But before I talk about causation, I want to be sure that we're utilizing the correct standard. So when plaintiff was arguing, he was asking the court to, both in his papers and just now during his oral argument, to use the substantial factor causation test. This is not a medical malpractice claim. The medical malpractice claim is currently pending in state court. That is a live case that we are currently litigating. For deliberate indifference, the district court made very clear what the correct standard is, and we also confirm that in our papers. And that standard is? On a 1983 claim under deliberate indifference theory, plaintiff must prove the official's actions were both the actual and proximate cause of the plaintiff's injuries. So we're using the traditional but-for test and foreseeability test when we're talking about whether or not this failure to evaluate the weight loss caused his death. So it can't just be a factor. Let's talk about that. Sure. Why can't we interpret the experts that have been provided as saying this man should have been treated? Had this man been treated in any way, then they would have been able to run the blood test, they would have been able to do all the things that would determine, you know, how to treat the individual. Why don't we treat those experts in that way? Well, so I guess looking at each of plaintiff's experts, so we'll take the...  We'll take Amalu. So what Amalu actually says is there was a failure to provide and evaluate for the weight loss. That resulted in the failure to determine the underlying cause of the weight loss. That underlying cause could be one of 25 different things. I don't know which one. I don't know what was causing the kidney failure and whether that kidney failure was treatable or not. I think he's saying something different. I think he's saying that it's the failure to treat that caused the death. In other words, he's saying specifically the autopsy confirms that if Hector was provided with adequate medical examinations and basic laboratory testing of his blood, the cause of his weight loss would have been identified and treated and his unexpected death at the age of 39 years old would have been avoided. That's at 2 ER 195. He said that. That's what the doctor said. He's... Well, he doesn't know what's causing the chronic kidney failure, so how can he opine as to what treatment they should or should not have done? That's what's missing. That's the piece. That's the dot that plaintiff's expert needs to connect. And without that, that is why the lower court was focused on without any evidence that says that the unidentified weight loss was related to chronic kidney failure and without any evidence from plaintiff's experts to say that kidney failure could have been treated, there's not enough to get to a triable issue of fact. Well, and the sort of ridiculous thing about the whole thing is the fact that had we had the blood work, we would have known that, but your client didn't do that. Well, what he's actually... I think what he's... This is part of the problem. We're really trying to build in a lot of assumptions to plaintiff's expert's testimony, and that was the issue that the lower court had, because there's all of these different puzzle pieces, and myself, the court, the lower court, the county, we're all trying to figure it out for plaintiff, because he never actually made any of the arguments that you're making. So putting that aside, to answer your question directly, the problem is with that theory is we're talking about an alleged misdiagnosis. Misdiagnosis, or failure to diagnose, is not deliberate indifference. That's a medical malpractice claim that we're litigating in the lower court. The deliberate indifference here is failure to evaluate the weight loss. Then we get into a very murky area, which is, well, maybe, maybe then it would have been kidney failure, and maybe the kidney failure could have been treated, and then maybe if it was treated, it maybe would have stopped his death. It's not enough. Do you have a case that tells us that failure to evaluate is not deliberate indifference? That draws the distinction between but-for, your actual cause, and substantial factor? The plaintiff didn't plead that there was a failure to... Pardon me, could you answer my question? No. Okay, thank you. Counsel, you still have two minutes. Does the panel have any further questions? On the issue of moving to the issue of the motion for leave to amend, I would like just to say that we agree with the lower court's finding that it would be futile. Curing the deficiencies in the allegation does not cure the deficiencies of the evidence. The plaintiff agreed during the hearing at the motion for summary judgment that the factual record would be the same, regardless of the proposed amendments. What we believe the... What we believe would happen was that it would just reopen discovery and would allow for plaintiff to do what it should have done, which is just go forward with the argument that there was deliberate indifference in treating the right-sided hydronephrosis of the kidney, and the failure to do so was the direct cause of his death. He didn't do that. Instead, we're going this roundabout way to say, oh, it's the weight loss that led to the kidney that led to maybe it would have been diagnosed and so on and so forth. And so what our position is is that the plaintiff isn't allowed, nor do the rules to amend his complaint give him the opportunity to take a third bite at the apple. All right. Thank you. Any other questions?  Any other questions? No. All right. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Noah Blechman. I'm here with my colleague, Denise Billups Sloan, on behalf of the Appellee County of Alameda, the lone public entity and defendant for Alameda. Let me just simplify a few things for the Court here. As the Court's aware, for a 1983 action under each of these two causes of action, it's delivered in difference, but for a 1983, you have to have a person named. They don't have a person named, so that's their first fault with regard to that issue. The other way to do it, as the Court is aware, that a public entity can be deemed a, quote, person if you are making allegations under Monell for a custom practice or policy. Plaintiffs have conceded on the motion for summary judgment. They're abandoning their Monell claim and they don't argue otherwise as part of their appeal. So as we stand now, there is no viable constitutional claim, 1983 for delivered in difference, that they can make against the County of Alameda. So how they're trying to save that claim, it appears, is simply going to the branch about whether or not they should be granted leave to amend at this late time in the case to add Officer Hahn, a correctional officer. So I'd like to go to that point now. I believe the standard is abuse of discretion, and we believe that Judge Gilliam did not make any clear error of judgment with regard to his evaluation on those issues. If the court is going to do a de novo review, then we can look at, I think, all the Foeman factors, and I'd like to impress upon the court there are certainly more issues with regard to the... On denial of motion to amend, is our standard to do a de novo review or abuse of discretion? It's a little unclear, Your Honor. I think the way the plaintiffs are arguing it, because Judge Gilliam found that it was futile for the second amended complaint because they couldn't make a constitutional claim against Deputy Hahn, there is case law that says if the court rules on that issue, it's a de novo review of that point. We did argue all the Foeman factors. Judge Gilliam did consider several of them. But if the court's doing a de novo review, then I think all the Foeman factors are in play. Clearly, there's been a significant delay with regard to Deputy Hahn. They knew about Deputy Hahn in February of 2021 as part of a mediation. They actually deposed him in June of 2021, but they did not file and seek leave to add him to the case till September of 2021. So this is seven months after they knew about him, three months after they deposed him, and only a few weeks before our dispositive motion filing deadline. Clearly, there's also significant prejudice there would be to the county and specifically to Deputy Hahn if leave to amend would be granted. He'd be coming into this case after experts have been disclosed, after some experts deposed, rebuttal experts, after the deadline for summary judgment. And then finally, obviously, they've already gotten a chance, they've already gotten a bite of the apple with their prior filing of a First Amendment complaint. That's a consideration. But as to futility, the court found that Deputy Hahn in no way had any knowledge about any medical needs of this inmate, and Deputy Hahn's certainly in a little bit different position than medical personnel. Upon what basis of fact did the court so find? The court looked at the evidence with regard to Deputy Hahn. Deputy Hahn is just a correctional deputy. He's doing checks. There's no evidence in the record he knew about any mental health conditions, any medical conditions. He did know, I believe... Isn't this the case, the officer that was required to check on him every 15 minutes, and he didn't? That's correct, Your Honor. He was on a sort of suicide watch. That's how he ended up there. So he was required to check on him every 15 minutes, and he didn't do that? There was a period of time from 3.05 was the last check when Mr. Hernandez was breathing, he was laying in bed, that type of thing, and then the next check, yes, was at 4.20. But this would be a different case. He was on suicide watch. So I agree, this would be a different potential case against Deputy Hahn if Mr. Hernandez had committed suicide during that period of time. But that's not the issue. The issue is whether he had some medical needs that Deputy Hahn was deliberately indifferent to. The last point I want to make on that, and I shared some time with Ms. Sloan, Bill Sloan, she's dealing with any of the medical issues for the county. But the last point is, if Deputy Hahn, another prejudicial issue here, if he was in the case, certainly he would have had qualified immunity arguments at this point in time. Judge Gilliam essentially found that on the first prong, the constitutional claim, there was significantly insufficient evidence against Deputy Hahn under the Castro-Gordon elements, essentially elements two, three, and four, about, you know, objective deliberate indifference. So that's another significant consideration for the court. He didn't get the opportunity to make those qualified immunity arguments. And he wouldn't? If we allowed the amendment, he wouldn't have those opportunities? No, he would certainly have those arguments. But at this point in the time, you know, post-dispositive motion up on appeal here, you know, it's tough to talk about in a vacuum, but he'd certainly have those rights preserved if he's brought in. Counsel, I see you're sharing your time and you're over your time. So unless there are any questions, thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Denise Billups Sloan and I'm here with Mr. Bleckman representing the County of Alameda. And I want to address the issue of the burden of proving to a reasonable degree of medical probability that there was actual and approximate causation of Mr. Hernandez's death at the hands of the County by actions or inaction of the County. I believe that Judge Gilliam got it right in his ruling when he said in short plaintiff's expert witness's failure to explain how defendant specific conduct caused Mr. Hernandez's death is required by the deliberate indifferent and wrongful death claim and it wasn't done in this case. This Court and the U.S. Supreme Court require vigorous standards of proof of culpability and causation by a defendant governmental entity and those vigorous standards of proof were obviously not met by the Plaintiff's Council here. Plaintiff's  did submit Rule 26 statements from forensic pathologist Dr. Bennett Amalu and osteopathic Dr. Swaby in opposition to the motion for summary judgment. Those Rule 26 statements were not submitted under penalty of perjury. However, even if the  deemed them admissible which Judge Gilliam did consider them, they did not state anything in terms of the cause of death they did not  And this is at 2 ER 197 Mr. Amalu died of sudden cardiogenic death. He then also said later on page 2 ER 196 that he found evidence in his pathologic examination that the histomorphology of the heart was consistent with a type 3 myocardial injury which will result in sudden and  death. He then goes on at the same page to say that his evaluation of the lungs which he  were heavy and enlarged due to them filling up with  He said his analysis revealed diffuse acute and severe pulmonary congestion and edema typically seen in fulminant cardiogenic pulmonary edema. Again he says at page 196 in a different spot that his findings were consistent with terminal meaning death terminal cardiogenic vasogenic diffuse brain injury due to  cardiogenic death. Time and time again Dr.  the plaintiff's expert says this was a  and unexpected death. Yes he goes on to speculate. As a result of non-treatment. No he goes on to speculate well this patient seemed to have lost weight. There's many causes of weight loss. No I'm sorry I disagree with your answer. Because I'm quoting Dr. Amalu's exam and his exam at 195 says that with adequate medical examination you could have found out all of these things and all of these conditions and the different options of possible death that could have occurred here. And my response to that is  that's purely speculative. Number one the county is not vicariously liable for the health care provided by CFMG and I'm not contending that they provided inadequate care. But even if they did the county is not responsible for that. Number two Dr. Amalu's opinion Well your first point I thought that you were here to talk about the medical. I think council addressed that issue and the Monell concerns. I understand very well. Right. And so going to your point your honor that Dr. Amalu says well if he had been examined appropriately these things would have been found. What things? He's listed 26 different possible causes for weight loss. What if we found that Mr. Hernandez had a terminal brain tumor? What if we found he just hadn't eaten enough? We don't know. It's purely speculative and it certainly doesn't rise to the probability standard that's required to prove actual and proximate causation. Counsel, I don't have any other questions but I don't know if my colleagues have any questions. Thank you. Okay. Thank you your honor. If you have no other questions for the  As to this notion that there's a life case in state court, the case was remanded to state court. However, the parties have agreed to stay that case pending resolution of this so no one is litigating actively in state court. We're going to    The report is under penalty of perjury.  cite two ER 186 and two ER 206. Those are their declarations signed under penalty of  attaching their reports as exhibits. I want to take a moment  say because we don't know what the cause was, it's difficult to know whether we could have identified and prevented the death of your client. Unexplained weight loss has many causes medical and nonmedical. These generally result in progressive decline of health and critical weight loss. One of those is changes in diet or  Had we evaluated your client we might have decided he had a change in diet or appetite. That's not a cause of his  His death resulted from something else. If we said you had a change in your diet, then there's no causation here. There's no liability. This is all speculation. This feels more like a medical malpractice claim than a deliberate indifference claim. He was seen by medical professionals on multiple occasions. He was seen by a nurse. A dietitian also came. But no one with diagnostic powers ever saw him. No one that could evaluate and say this is what you're eating. He was never seen by a doctor. A nurse can't diagnose him. A nurse can't say what's wrong. Going back to the list, yes, there's a list at 2ER 195 that explains all the things that can cause unintended weight loss. However, on 2ER 197, their doctor specifically states to a reasonable degree of medical certainty what the cause of death was. He's the pathologist. He says preventable and avoidable critical weight loss, the underlying cause of which was advanced kidney disease that was not clinically investigated. We don't know that the kidney disease was causing his unintended weight loss. There's a connection running both directions there, but it's just not at all clear. Well, again, the standard here is our expert says that's what it was. I understand that there are other experts saying that's not what it  He never saw the cause of  That's what he does. And again, Lemire is very clear. It says if reasonable persons could differ on the question of causation, then summary judgment is inappropriate and the question should be left to the  Here, the trial court invaded the province of the jury. A jury could have reached the inference that our experts are correct. And that's all we had to do to overcome summary judgment. And I do want to raise one last issue that was raised in our papers as well. We're talking about death here, but that wasn't the only injury. Mr. Hernandez was in jail for two months suffering from this chronic weight loss. Two months sending notes saying, hey, I'm concerned. I'm losing a lot of weight. For two months he was never evaluated. That's deliberate indifference under Castro, even though we're not talking about death. And the damages you claim from that is emotional and physical pain? Even if it's nominal damages, Your Honor, it goes back to the  Would you answer my question? You're asking for emotional and physical pain during the weight loss? Yes, Your  And that survives his  Yes. And then on the leave to  the case law is pretty clear that if leave amend is not granted on futility grounds, then it is a significant   not          submit discovery letter brief to be able to get the records, then we had to wait many months to get the slides so our expert could review it. But even despite all those efforts, we submitted our motion for leave to amend weeks before the motion for summary judgment was due. We gave them notice. We actually asked them to stipulate to it so that way they could address it. And they did address it in their motion papers. So there is no prejudice here, Your Honor. All right. Are there any other questions? Any other questions? All right. Thank you, counsel. Thank you to all counsel for your presentations. The matter of Hector Hernandez versus County of Alameda and California Forensics Medical Group is submitted at this point. And with that, we conclude today's proceedings. Thank you very much. Thank you, Your Honor. Thank you,
judges: BYBEE, BEA, MENDOZA